UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

**FILED**
MAR 2 2 2007
CLERK

| | | |
|---|---|---|
| ST. PAUL REINSURANCE CO. LTD., | ) | CIV. 05-5077-RHB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| HOWARD BALDWIN, individually | ) | AND ORDER |
| and doing business as LIVE LINE | ) | |
| MAINTENANCE; and JAMES | ) | |
| CORNELIUS, | ) | |
| | ) | |
| Defendants. | ) | |

I.   INTRODUCTION ............................................................... 1
II.  BACKGROUND ................................................................ 2
     A.   Facts ................................................................. 2
     B.   Procedural History ................................................... 6
III. STANDARD OF REVIEW ........................................................ 7
IV.  DISCUSSION ................................................................ 8
     A.   Diversity Jurisdiction ............................................... 8
     B.   Choice of Law ........................................................ 9
     C.   South Dakota Law: Insurance Policy Interpretation ................... 10
V.   CONCLUSION ............................................................... 19

I.   INTRODUCTION

This matter is before the Court on plaintiff St. Paul Reinsurance Company Limited's motion for summary judgment. For the reasons set forth below, plaintiff's motion for summary judgment is granted.

## II. BACKGROUND

### A. Facts

Defendant Howard Baldwin ("Baldwin") owns Live Line Maintenance ("Live Line") as a sole proprietorship and has been operating the business out of Sturgis, South Dakota. (Def. Cornelius's Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("CMLO") at 2.) Baldwin's business furnishes construction and maintenance services to electric cooperatives in rural areas of South Dakota, Wyoming, and Nebraska. (See id. at Ex. G.)

In 1996, defendant James Cornelius ("Cornelius") came to work for Baldwin and Live Line. (Howard Baldwin's Dep. at 148-49.) At the time Cornelius was hired, he received no formal training from Baldwin, because Baldwin was of the opinion that both men's level of experience was approximately the same. (Id. at 94.) Baldwin, nonetheless, was Cornelius's day-to-day supervisor, with contact between the two of them taking place three times per day. (James Cornelius's Dep. at Vol. II, 150-51.) For example, as the owner of Live Line, Baldwin decided whether Cornelius had to go to work when weather was inclement. (Id. at 164-65.)

At the outset of Cornelius's work for Live Line, Baldwin gave Cornelius $500.00 to use for purchasing necessary items for work projects and other job-related expenditures. (Baldwin's Dep. at 73-74.) As time passed, Cornelius earned the authority to instead spend whatever amount necessary and subsequently present

Baldwin with the receipt for reimbursement. (Id.; Cornelius's Dep. at Vol. II, 152-53.) When he started in 1996, Cornelius was a groundsman paid for changing out poles at a rate of $15.00 per pole. (Cornelius's Dep. at Vol. I, 32-34.) During that time, pole changes were Live Line's only form of business, (id. at 35-36), and Cornelius was Live Line's only crew member, (id. at 32-34).

From 1997 to 2002, Cornelius was a primary operator of a bucket truck, which Baldwin maintained, serving as a lineman for Live Line. (Id. at 65-66.) With Cornelius's new position as a lineman came an increase in compensation from $15.00 to $30.00. (Id. at 85.) At the latter part of his time with Live Line, Cornelius was making $35.00 and considered the supervisor of Live Line among Baldwin's other crew members, which included Baldwin's son, Steve. (Baldwin's Dep. at 79-80, 85.) Cornelius was also permitted to hire Ted Herring, a Live Line worker who primarily assisted Cornelius for roughly one and one-half months. (Ted Herring's Dep. at 5.)

When traveling to work sites from home, and conversely, Cornelius used a Live Line material vehicle for his commute, avoiding having to ever use a personal vehicle on the job. (Cornelius's Dep. at Vol. I, 56-57.) As for Cornelius's bucket truck, it was usually left at the job site near the location that the electrical line maintenance work ceased for the day. (Id.)

Beginning in late 1999, Live Line and Powder River Energy Corporation ("PRE Corp."), a Wyoming corporation, entered into a contractual relationship in which Live

3

Line performed maintenance work on electrical lines owned by PRE Corp. (Baldwin's Dep. at 148-49.) When Live Line and PRE Corp. formed their contract, Cornelius was assigned by Baldwin to work on PRE Corp.'s power lines. (Id. at 151.) Baldwin, though, limited his participation with his business to that of securing contracts with companies like PRE Corp., not performing field work. (Cornelius's Dep. at Vol. I, 37.)

In rendering his services under the contract, Baldwin was responsible for providing his workers any necessary equipment and tools to perform Live Line's work, such as bucket trucks, air guns, pneumatic wrenches, hammers, pliers, insulated gloves, and insulated sleeves, (Baldwin's dep. at 135-36, 157-58), though PRE Corp. supplied all of the material used on its electrical lines, (id. at 58). Baldwin was also obligated to take care of Live Line's safety procedures for its workers, to hire qualified workers, and to comply with governmental statutes, regulations, or rules applicable to the business's services. (Id. at 135-36.) As a corollary, the contract mandated that Baldwin "take out and maintain throughout the period of this Agreement . . . minimum amounts of insurance." (CMLO at Ex. G) PRE Corp., however, did not provide Live Line workers with training, instruction, or safety courses, since Baldwin and his linemen were not PRE Corp. employees. (Baldwin's Dep. at 95, 156-58.) Although PRE Corp. supervisors occasionally observed Live Line's work, and although PRE Corp. retained a right under the contract to inspect Live Line's work, (see CMLO at ex. G; Baldwin's dep. at 46-50, 163), Baldwin's work crews retained discretion on how to proceed with their job,

4

(Baldwin's dep. at 158-59). In addition, PRE Corp. did not withhold employment taxes, income taxes, or workers' compensation premiums from any payments made to Live Line. (Id. at 157.)

On February 21, 2002, a meeting was held with Baldwin and four PRE Corp. employees, which included a supervisor with the company, Lyle Brice. (Id. at 53-54.) The purpose of the meeting was to address safety and operational issues as they pertained to Live Line and its workers. (Id. at 54-55.) Specifically, the discussion centered around the quality of Live Line's work, a problem with one of Live Line's trucks leaving oil slicks near PRE Corp. power lines, an issue relating to material being left at PRE Corp. job sites, and a complaint regarding the smell of alcohol emanating from Cornelius during work hours. (Id. at 55-58.) Because PRE Corp. would, or at least have a reason to, terminate the contract with Live Line, (id. at 59-60), Baldwin expressed the most concern over the last topic of discussion, wanting to grab Cornelius "by the throat and squeeze." (Id. at 55.)

Confronting Cornelius with the alcohol issue at the next available opportunity, Baldwin questioned Cornelius and asserted that such conduct was intolerable. (Id. at 59.) Baldwin also informed Cornelius that if he continued to drink while performing services under the PRE Corp. contract, both of them would be out of work. (Id.) In response, Cornelius denied the accusation of drinking on the job. (Id. at 60.)

5

Due to unresolved issues between PRE Corp. and Live Line, which were unrelated to Cornelius's purported on-the-job drinking, PRE Corp. terminated the contract with Live Line on February 25, 2002. (CMLO at 3.) The effective termination date of the contract was set for March 25, 2002. (Id.)

On March 11, 2002, two weeks prior to the effective termination date, Cornelius was electrocuted while performing maintenance on a live electrical line owned by PRE Corp., whereby he sustained serious bodily injuries. (Id. at 1-2.) Earlier that same day, Cornelius used a Live Line material truck to pick up another Live Line worker and drive to the work location. (Cornelius's Dep. at Vol. II, 21.) Cornelius kept that material truck at his residence in order to travel to the work site. (Id.) At the time of the incident, Cornelius was using equipment and a bucket truck that were provided by Baldwin. (CMLO at 2.) Until the date he suffered these injuries, Cornelius was usually the only Live Line crew member to use the bucket truck in which he was injured. (Cornelius's Dep. at Vol. I, 55-56.)

### B.  Procedural History

On September 8, 2005, plaintiff St. Paul Reinsurance Company Limited filed its complaint seeking declaratory relief. Plaintiff originally brought this declaratory action against defendants Baldwin, individually and doing business as Live Line, Cornelius, and PRE Corp. On November 7, 2006, PRE Corp. was dismissed, with prejudice, as a party to this lawsuit. In its complaint, plaintiff requests that the Court declare that the

insurance policy plaintiff issued to Baldwin and his business, Live Line, contained an exclusion in coverage for Live Line "employees" and "bodily injuries" sustained by an employee while operating in the course of Live Line's business. (Compl. at 1, 3; see Pl.'s Br. in Supp. of Mot. for Summ. J. ("PBS") at 2.) Plaintiff filed a motion for summary judgment on November 1, 2006, with defendant Cornelius responding in opposition on November 28. Defendants Baldwin and Live Line failed to file a responsive brief to plaintiff's motion. On December 8, 2006, plaintiff submitted a reply to defendant Cornelius's response, with defendant Cornelius again filing a response on December 22, 2006, as to the issue of timeliness raised by plaintiff. On February 28, 2007, plaintiff submitted a supplemental disclosure in support of its motion, citing the Wyoming Supreme Court's decision of Cornelius v. Powder River Energy Corp., 2007 WY 30, 152 P.3d 387 (Wyo. 2007).

### III. STANDARD OF REVIEW

"Summary judgment is proper if, viewing the record in the light most favorable to defendants, there is no genuine issue of material fact" and plaintiff is "entitled to judgment as a matter of law." Myers v. Richard County, 429 F.3d 740, 750 (8th Cir. 2005) (citing FED. R. CIV. P. 56(c) (1987)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91

L. Ed. 2d 202 (1986)). As such, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." Id. at 247-48, 106 S. Ct. at 2510 (emphasis in original). "There is no genuine issue of material fact if the evidence is such that no reasonable jury could return a verdict for [defendants]." Robinson v. White County, Ark., 452 F.3d 706, 709 (8th Cir. 2006) (following Anderson, 477 U.S. at 248, 106 S. Ct. 2510). Initially, "[t]he party moving for summary judgment has the burden of proof to show there is no genuine issue of material fact." Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780, 783 (8th Cir. 2006) (adhering to Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Once the moving party satisfies this burden, however, the non-moving parties bear an affirmative burden "to go beyond the pleadings and, by affidavit or otherwise, produce specific facts that show that there is a genuine issue for trial." Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005); FED. R. CIV. P. 56(e).

## IV. DISCUSSION

### A. Diversity Jurisdiction

Plaintiff, a corporation organized and existing under the laws of England, commenced this action against these South Dakota and Wyoming defendants, satisfying the requirement of complete diversity of citizenship between the parties. 28 U.S.C. § 1332(a) (2005). The amount in controversy also exceeds the statutory amount

8

enunciated in 28 U.S.C. § 1332, thereby establishing diversity jurisdiction. Id. (mandating an amount in controversy exceeding $75,000, exclusive of interest and costs).

## B.   Choice of Law

Because suit was brought in this federal district, South Dakota is the forum state and its choice-of-law rules are applied to determine the rights of the parties in this action. Allianz Ins. Co. of Canada v. Sanftleben, 454 F.3d 853, 855 (8th Cir. 2006). See generally Pecoraro v. Diocese of Rapid City, 435 F.3d 870, 873 (8th Cir. 2006) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)). Under South Dakota law, in determining which state's law to apply, the Court must consider the nature of the action. Great West Cas. Co. v. Hovaldt, 1999 S.D. 150, ¶8, 603 N.W.2d 198, 201. This suit sounds in contract, and policy coverage is the issue, not tort liability. Id. Pursuant to South Dakota Codified Law 53-1-4, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." S.D. CODIFIED LAWS § 53-1-4 (1939). "Generally, unless the parties agree otherwise, an insurance contract is 'made' at the place where the last act necessary to its completion is accomplished." Hovaldt, 1999 S.D. 150, ¶9, 603 N.W.2d at 201 (quoting Briggs v. United Services Life Ins. Co., 80 S.D. 26, 30, 117 N.W.2d 804, 807 (1962)). Here, the commercial general liability insurance policy was delivered in South Dakota, by a

South Dakota insurance agent, for the benefit of a South Dakota sole proprietorship, whose owner resides in Sturgis, South Dakota. Although both parties agree that South Dakota law governs, (PBS at 3; CMLO at 6), the last act necessary to finalize the insurance contract transpired in South Dakota. Therefore, South Dakota law applies.

### C. South Dakota Law: Insurance Policy Interpretation

"In order to ascertain the terms and conditions of a contract, we must examine the contract as a whole and give words their 'plain and ordinary meaning.'" Gloe v. Union Ins. Co., 2005 S.D. 30, ¶29, 694 N.W.2d 252, 260 (following Elrod v. Gen. Cas. Co. of Wis., 1997 S.D. 90, ¶15, 566 N.W.2d 482, 486 (further citations omitted)). The Court "will not resort to a forced construction of the language in a contract for the purpose of either limiting or extending coverage." Id. (citing Farm & City Ins. v. Estate of Davis, 2001 S.D. 71, ¶6, 629 N.W.2d 586, 587 (further citations omitted)). "Further, the scope of coverage of an insurance policy is determined from the contractual intent and the objectives of the parties as expressed in the contract." St. Paul Fire & Marine Ins. Co. v. Schilling, 520 N.W.2d 884, 887 (S.D. 1994) (adhering to City of Fort Pierre v. United Fire & Cas. Co., 463 N.W.2d 845, 848 (S.D. 1990) (citation omitted)).

In support of its motion for summary judgment, plaintiff argues that Cornelius was an "employee" of Live Line and operating in the course of that employment at the time he was injured. (PBS at 19.) Through the numerous facts demonstrating Cornelius's status as a Live Line "employee," therefore, plaintiff asserts that the clear

10

and unambiguous language of the insurance policy excludes coverage for Cornelius's claims. (Id.)

Opposing plaintiff's motion, Cornelius contends that "[a] question of fact exists as to whether [he] was an 'employee' as defined within the policy." (CMLO at 7.) According to Cornelius, because he was performing work exclusively for PRE Corp., his duties as a worker do not coincide with that of the definition of "employee" under the insurance policy and the law of South Dakota. (Id.) Instead, under the circumstances of his relationships with Live Line and PRE Corp., Cornelius maintains that a more apt term to characterize his status is that of "independent contractor." (Id. at 7-8, 10-11.) Thus, as an independent contractor, Cornelius argues that the exclusionary provisions of the insurance policy are inapplicable to his claims. (Id. at 13.) Furthermore, as Cornelius postulates, the term "employee" as utilized in the policy is ambiguous and susceptible of more than one interpretation. (Id. at 9, 12-13.)

The terms of the insurance policy at issue in this matter were in effect from September 9, 2001, to September 9, 2002, and provided numerous provisions that listed the policy's coverage areas, exclusions, and definitions. (See PBS at Ex. 1.) Pursuant to policy language, "[t]he word 'insured' means any person or organization qualifying as such under" the "who is an insured" section. (Id. (capitalization omitted).) "Insured[s]" under the policy included "individual[s]," such as Baldwin, "but only with respect to the conduct of a business of which" the individual was the sole owner, as well as that

11

individual's "employees." (Id.) However, as an exclusion, which is the crux of the issue here, the commercial general liability policy barred insurance coverage for an "Employer's Liability" as to "'Bodily Injury' to: (1) An 'employee' of the insured arising out of and in the course of: (a) Employment by the insured; or (b) Performing duties related to the conduct of the insured's business . . . ." (Id.) As stated in the policy, "'[e]mployee' includes a 'leased worker.' 'Employee' does not include a 'temporary worker.'" (Id.) "'Leased worker' means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business." (Id.) Conforming to the "employee" definition above, a "'[l]eased worker' does not include a 'temporary worker.'" (Id.) Lastly, "'[t]emporary worker' means a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." (Id.)

"Although the language in insurance contracts is to be construed liberally in favor of the insured and strictly against an insurer, that rule of construction applies only when the language of the contract is ambiguous." Schilling, 520 N.W.2d at 887. In this case, the term "employee" as used in the insurance policy is not ambiguous. Throughout the policy and as the term relates specifically to the language of the exclusionary provision, "employee" is utilized in conjunction with that of the insured's form of business, with that of any injuries arising out of or in the course of employment for the insured, and with that of the employee's performance of duties related to the

conduct of the insured's business. "Employee" is a term used in common, everyday parlance with the following definitions: "a person who works for another," The Merriam-Webster Dictionary 236 (11th ed. 2004); "one employed by another usu. in a position below the executive level and usu. for wages," Webster's Third New Int'l Dictionary 743 (3d ed. 1971); "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance," Black's Law Dictionary 543 (7th ed. 1999). These definitions conform to the insurance policy's usage of the term. The insurance policy's use of the term also fits South Dakota's definition of "employee." According to South Dakota Codified Law § 60-1-1, "[a]n employee is one who is employed to render personal service to his employer otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter who is called his employer." Id. (1939). There is nothing exotic about the word "employee," nor is there anything exotic about the policy's use of the term. Thus, when reading the policy as a whole, nothing in the policy's language makes "employee" susceptible of two or more meanings.

Although the policy states what constitutes an "employee" by including a "leased worker" within the definition of "employee," (PSB at ex. 1), the inclusion merely broadens the scope or, in other words, adds to the definition of "employee," rather than making the term subject to two meanings. It also declares what does not constitute an

13

"employee" by excluding from its meaning the definition of a "temporary worker," (id.), similar to § 60-1-1's definition of "employee." See S.D. CODIFIED LAWS § 60-1-1 (including "employee" as those who provide service to an employer by "remain[ing] entirely under the control and direction" of the employer, but excluding workers who pursue an independent calling). And even though a definition of "employee" is not supplied in the policy, a term does not become ambiguous merely because a definition is not given.

Pursuant to the foregoing analysis, the term "employee" must be given its plain and ordinary meaning.* Under the policy's unambiguous use of the term, therefore, the Court must then determine whether Cornelius was an employee to Baldwin and Live Line.

Cornelius argues that he served at the pleasure and direction of PRE Corp. as an independent contractor, rather than as an employee of Live Line. In support of his proposition, Cornelius points to Baldwin's answer to plaintiff's complaint where he stated that Cornelius "[w]as hired as a subcontractor and paid the same way." (Def. Baldwin's Answer at 1.) Among other things, Cornelius avers that "Live Line did not withhold any social security or employment taxes from [his] income, as he was

---

\* Even assuming the insurance policy's use of the word "employee" is ambiguous, under the facts of this case, Cornelius's work for Baldwin and Live Line was neither as an independent contractor nor as a temporary worker. See infra Section IV. C. at 15-19.

14

provided [a] Form 1099[,]" (CMLO at 11-12.), which is a form typically used by independent contractors.

"In determining whether an individual is an employee or an independent contractor, each case must be determined on its own facts and all the features of the relationship are to be considered." Egemo v. Flores, 470 N.W.2d 817, 820 (S.D. 1991) (citing Dumire v. Martin, 84 S.D. 572, 575, 174 N.W.2d 215, 216-17; Steen v. Potts, 75 S.D. 184, 186, 61 N.W.2d 825, 826 (1953)). Under South Dakota law, there are two primary factors utilized to test whether a worker is an employee or an independent contractor. Id. at 821; Davis v. Frizzell, 504 N.W.2d 330, 331 (S.D. 1993). The first inquiry is whether the individual worker was "'free from control or direction over the performance of the services, both under contract of service and in fact . . . .'" Egemo, 470 N.W.2d at 821 (alteration omitted) (quoting Appeal of Hendrickson's Health Care Serv., 462 N.W.2d 655, 658 (S.D. 1990)). The second factor asks whether the individual worker was "'customarily engaged in an independently established trade, occupation, profession or business.'" Id. (alteration omitted) (following Hendrickson's Health Care, 462 N.W.2d at 659. "These two factors, together with any other facts particularly probative of the nature of the employment relationship at issue, form the basis of our inquiry," id., with the first query serving as "the primary element in determining whether an employer-employee relationship exits," Buisker v. Thuringer, 2002 S.D. 81, ¶12, 649 N.W.2d 817, 821.

15

With respect to the first factor, commonly referred to as the "right of control test," "important considerations include direct evidence of the right of control, the method of payment, furnishing major items of equipment, and the right to terminate the employment relationship at will and without liability." Egemo, 470 N.W.2d at 821 (citation omitted). The facts of this case demonstrate that Baldwin, as owner of Live Line, hired Cornelius to work for the business in 1996 and that Cornelius held Baldwin out as the supervisor of day-to-day activities, with contact between the two of them occurring three times per day. The work Cornelius performed for Live Line was the only form of work he engaged in until he was injured in March 2002. Additionally, Baldwin made the ultimate decision as to whether crew members, such as Cornelius, were required to work on days when the weather was poor. During his work for Live Line, Cornelius was authorized to purchase items for Live Line work projects and other job-related expenses. Cornelius was reimbursed for these Live Line expenditures once he presented Baldwin with a receipt. Cornelius was also vested with the authority to hire a Live Line crew member, Ted Herring. When Cornelius traveled to and from work sites, he used a Live Line material vehicle. As such, he was never required to use a personal vehicle when commuting to a Live Line job site. From 1997 to 2002, he was a primary operator of a bucket truck. Baldwin, though, maintained at his expense both the material vehicle and bucket trucks.

When Live Line and PRE Corp. entered into their contractual relationship, Cornelius was already a part of Live Line's work force for approximately three years. Once the contract was formed, Cornelius was directed by Baldwin to work on PRE Corp.'s power lines. Although PRE Corp. furnished the materials for use on its electrical lines, Baldwin provided his crew the necessary equipment and tools to perform Live Line's work. Baldwin, and in effect Live Line, was an independent contractor of PRE Corp. Under Baldwin's and PRE Corp.'s contract, Baldwin was obligated to manage Live Line's safety procedures and hire qualified individuals, like Cornelius. PRE Corp., however, was under no duty to provide Live Line employees with training, instruction, or safety courses. Indeed, PRE Corp. supervisors observed and inspected Live Line's work, but according to Baldwin's testimony, he and his linemen were not PRE Corp. employees.

PRE Corp.'s complaint to Baldwin regarding the smell of alcohol effusing from Cornelius during work hours may serve as the most probative example of an employer-employee relationship between Baldwin and Cornelius. After hearing PRE Corp.'s allegation, Baldwin handled the situation by immediately questioning Cornelius and asserting that such conduct was impermissible. PRE Corp. approached Baldwin with the accusation, not Cornelius. Baldwin, then, confronted Cornelius. This situation is highly indicative of an employer-employee relationship. Moreover, Baldwin could have terminated Cornelius at any time, and, without recourse, Cornelius also retained

the discernment of whether to quit working for Baldwin.

Although Cornelius received a 1099 tax form from Baldwin, and although Baldwin's answer to the complaint sets forth that Cornelius "was hired as a subcontractor and paid the same way," such a method of payment is not dispositive and such a statement is not evidence. According to Cornelius's deposition testimony, Live Line was Cornelius's only form of employment and compensation from 1996 to 2002, especially since he made more money working for Baldwin than anywhere else. Furthermore, PRE Corp. did not withhold employment taxes, income taxes, or workers' compensation premiums from any payments made to Live Line.

Lastly, on the date Cornelius was injured, he used a Live Line material truck with another Live Line employee as transportation to the work location. The material truck Cornelius was driving was kept at his residence. At the time of the accident, Cornelius was operating a Live Line bucket truck and using Live Line equipment. Hence, under the aforementioned facts and circumstances, the evidence is probative of the right of control in this matter.

As to the second factor, commonly referred to as the "independently established trade test," the employee's occupation must be independently established and the employee must be customarily engaged in it, such that an enterprise has been "created and existing separate and apart from the relationship with the particular employer . . . ." Egemo, 470 N.W.2d at 822. The enterprise must be able to withstand the termination of

the purported relationship with the employer. Id. "The individual must have a proprietary interest in the enterprise to the extent that she or he can operate it without hinderance [sic] from any other individual." Id. (brackets removed).

Under this test, it logically follows that an individual must first establish that an enterprise existed. Id. See Davis, 504 N.W.2d at 331-32 (setting forth the Hendrickson's Health Care four-part test, with the first prong as "[a]n enterprise independently established"). Here, however, there is no evidence to support a finding that Cornelius possessed "a proprietary interest in [any] enterprise" other than his work as a Live Line employee and at the pleasure of Baldwin. Egemo, 470 N.W.2d at 822. Cornelius never held himself out as an independent business person; that is, he was not engaged in advertising, nor did he maintain a separate business premises. See Jackson v. Lee's Travelers Lodge, Inc., 1997 S.D. 63, ¶12, 563 N.W.2d 858, 861.

The well-established law of this state, coupled with the facts of this matter, prescribes that Cornelius served, functioned, and operated as a Live Line employee, not as an independent contractor for PRE Corp. or himself. Cornelius cannot also argue that he fell under the "temporary worker" definition, because he was neither substituting for a permanent employee nor serving as a seasonal or short-term worker. Cornelius was, in fact, a permanent employee of Live Line for six years. Hence, while working for Baldwin and his business, Cornelius's conduct conforms to the definitions of "employee." As such, Cornelius cannot avoid the policy's exclusionary provision.

19

V.    CONCLUSION

Under the facts of this case, Cornelius worked for Baldwin, doing business as Live Line, as an employee. Pursuant to the terms of the insurance policy at issue, "employees" are excluded from coverage for bodily injuries suffered in the course of employment by the insured or performing duties related to the conduct of the insured's business. Thus, neither defendant is entitled to indemnification for any claims arising out of the March 11, 2002, incident, whereby Cornelius sustained bodily injuries. Accordingly, it is hereby

ORDERED that plaintiff St. Paul Reinsurance Company Limited's motion for summary judgment (Docket #26) is granted.

IT IS FURTHER ORDERED that judgment shall issue forthwith in favor of plaintiff St. Paul Reinsurance Company Limited and against defendants Howard Baldwin, individually and doing business as Live Line Maintenance, and James Cornelius.

Dated this 22nd day of March, 2007.

BY THE COURT:

_____
RICHARD H. BATTEY
UNITED STATES DISTRICT JUDGE